## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

**Case No.:**

SERIES 15-09-321, a Delaware entity,

     Plaintiff,

v.

PROGRESSIVE CORPORATION;
PROGRESSIVE AMERICAN
INSURANCE COMPANY; PROGRESSIVE        **COMPLAINT**
SELECT INSURANCE COMPANY;                **DEMAND FOR JURY TRIAL**
PROGRESSIVE DIRECT HOLDINGS, INC.;
PROGRESSIVE CASUALTY INSURANCE
COMPANY; PROGRESSIVE CLASSIC
INSURANCE; PROGRESSIVE
NORTHWESTERN INSURANCE
COMPANY; PROGRESSIVE ADVANCED
INSURANCE COMPANY; PROGRESSIVE
HAWAII INSURANCE CORPATION; and
PROGRESSIVE CLAIMS MANAGEMENT,

     Defendants.

_____/

## COMPLAINT

Plaintiff, Series 15-09-321 brings this action against Progressive Corporation, Progressive American Insurance Company, Progressive Select Insurance Company, Progressive Direct Holdings, Inc., Progressive Casualty Insurance Company, Progressive Classic Insurance, Progressive Northwestern Insurance Company, Progressive Advanced Insurance Company, Progressive Hawaii Insurance Corporation, and Progressive Claims Management (collectively the "Defendants") and alleges:

## INTRODUCTION

1.     The Medicare program spent $756 billion (roughly 12% of the entire federal

budget) in fiscal year 2022 to provide health insurance for roughly 65 million people (around 20% of the U.S. population) who are aged 65 and older or have disabilities. With the aging population expected to become nearly a quarter of the U.S. population by 2060 (95 million people), one of Medicare's main trust funds is expected to run dry by 2028.[1] For these reasons, identifying and correcting fraud, waste, and abuse—and ensuring the Medicare pays only for bills Congress intended to pay—is more important now than ever before to ensure the long-term sustainability of an essential federal program that has been in existence since 1965.

2.      More than 40 years ago, in 1980, Congress first addressed fears regarding Medicare insolvency by passing with overwhelming bipartisan support the Medicare Secondary Payer Act (the "MSP Act"). The intent of the MSP Act was to staunch the tide of "ballooning medical entitlement costs." *Netro v. Greater Baltimore Med. Ctr., Inc.*, 891 F.3d 522, 524 (4th Cir. 2018). Prior to the MSP Act, Medicare paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained. With the MSP Act, Congress mandated that auto insurers like Defendants—rather than Medicare—would become primarily responsible for medical expenses covered by their insurance policies.

3.      Instead of allowing insurers to accept premiums from their policyholders and then sit back while Medicare paid medical bills covered by the insurers' policies, Congress mandated that the insurers would be primary payers and Medicare would simply provide a safety net for its beneficiaries in the event the insurance carriers did not promptly pay. In short, Congress intended through the MSP Act to transfer the cost and financial burden of healthcare to private insurance

---

[1] https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/07/fact-sheet-the-presidents-budget-extending-medicare-solvency-by-25-years-or-more-strengthening-medicare-and-lowering-health-care-costs/ (last visited October 5, 2023) ("[T]he most recent Medicare Trustees Report projected that the HI Trust Fund would be insolvent in 2028 . . . ."). The HI Trust Fund provides funding for Medicare Part A services, such as hospital stays.

plans who were receiving premiums expressly intended to cover the medical expenses being paid by Medicare prior to the MSP Act. Congress enacted section 1395y(b)(1) to reduce federal expenditures by making private automobile insurers primarily liable for the cost of servicing their policies.

4.     Subsequently, when Congress created the Medicare Advantage option under Part C of Medicare, 42 U.S.C. § 1395w-21(a)(1)(B), it ensured that Medicare Advantage Organizations ("MAOs"), just like Medicare, would be deemed the *secondary payer* when the Medicare beneficiaries' medical expenses are covered concurrently by other insurance policies. 42 U.S.C. § 1395w-22(a)(4). Medicare Part C permits Medicare beneficiaries to choose to receive their health 4care benefits from private insurers through MAOs. As of June 2023, over 31 million individuals—nearly 40% of all Medicare beneficiaries—had elected to enroll with an MAO and participate in a Medicare Advantage Plan ("MA Plan").[2]

5.     To protect Medicare beneficiaries, Congress authorizes both Medicare and MAOs to go ahead and pay a beneficiary's medical expenses first when a primary player has not made or cannot reasonably be expected to make payment promptly. 42 U.S.C. § 1395y(b)(2)(B)(i). Such payments are "intended to minimize patient anxiety about the source of payment and to avoid delays in reimbursement for" medical expenses. H.R. Rep. No. 97-208, pt. 2, at 956 (1981) However, under the MSP Act, Medicare's and the MAO's payment is conditioned on the primary payer—the insurer—ultimately reimbursing Medicare and the MAO. 42 U.S.C. § 1395y(b)(2)(B)(ii). In this way, Medicare beneficiaries receive the health care they need, but

---

[2] Monthly Contract and Enrollment Summary Report, Ctrs. For Medicare & Medicaid Servs., https://www.cms.gov/ResearchStatistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/Monthly-Contract-and-Enrollment-Summary-Report        (last visited October 5, 2023)

Medicare remains entitled to reimbursement.

6.    When Medicare or an MAO makes a payment that a primary plan was responsible for, the payment is conditional. This rule applies any time an insurer contests liability at the time of the Medicare or MAO payment, or even where Medicare or the MAO paid for a medical expense simply because it "did not know that the other coverage existed." 42 C.F.R. § 411.21.

7.    To ensure that Medicare would be reimbursed, Congress provided the United States government a cause of action to obtain reimbursement from a primary plan. *See* 42 U.S.C. § 1395y(b)(2)(B)(iii). When that addition proved insufficient to ensure primary payers such as insurance carriers were reimbursing Medicare, Congress enacted a private cause of action so that persons and private entities could recover conditional payments made by Medicare (and, later on, MAOs) when insurers failed to reimburse Medicare and MAOs for the payments made for expenses that were covered by their insurance policies. Congress provided for double damages so that private litigants would be incentivized to pursue a recalcitrant insurer.  This has become even more important as each year that passes more Medicare beneficiaries are opting for Medicare Part C.

8.    Compliance with the MSP Act should lead to tremendous savings for the Medicare program. In 2021, minimal compliance by primary payers resulted in approximately $9.7 billion in savings. However, that's just the tip of the iceberg. According to an industry white paper, approximately 8 to 10% of all healthcare expenditures are related to some type of accident.[3] When a Medicare beneficiary is involved in an automobile accident, the beneficiary will almost always be insured for medical expenses either under the beneficiary's own auto insurance policy or under

---

[3] https://www.optum.com/content/dam/optum3/optum/en/resources/white-papers/StrengtheningPaymentIntegrity-SubrogtaionInjuryCoverageWhitePaper.pdf, p. 2 (last visited October 5, 2023).

the policy of another driver. However, as authorized by the MSP Act, Medicare frequently ends up conditionally paying the privately covered medical expenses first. Accordingly, with expenditures over $700 billion, one should expect Medicare and MAOs to be able to recover at least something within range of 8% expenditures, which would amount to tens of billions of dollars. Recoveries, however, are not even remotely close to those amounts because auto insurers have systematically disregarded their duty to comply with their obligations under the MSP Act.[4]

9.      Through years of investigation, including sending thousands of coordination of benefits letters to auto insurers across the country, Plaintiff has uncovered two strategies adopted by insurers that have contributed to the depletion of Medicare's trust funds by enabling insurers to evade their primary payer obligations. First, auto insurers, including Defendant, have done very little to identify or coordinate with MAOs who have made conditional payments, much less reimburse them. Those MAOs are ultimately funded from the same trust funds as Medicare.

10.      Second, auto insurers, including Defendant, fail to properly report to Medicare their primary payer tatus and related information as mandated by Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, PL 110-173 ("Section 111 reporting"). Through Section 111, on a quarterly basis, insurers are supposed to share data with Medicare that allows Medicare to determine whether it made a secondary payment that was in fact the responsibility of another insurer—the primary payer. However, auto insurers, including the Defendant, fail to gather the necessary Medicare information from the injured person or act on the data contained in bills sent to insurers by healthcare providers and, therefore, do not submit the information to Medicare

---

[4] https://www.tucsonsentinel.com/opinion/report/043023_gonzales_medicare_op/gonzales-pursuing-more-insurance-reimbursements-would-bolster-medicare-funding/ (last visited October 5, 2023) (opinion piece by Arizona State Senator Sally Gonzales observing that the insurance industry is "costing taxpayers billions yearly and putting Medicare at risk" and the MSP Act should be vigorously enforced "so that Medicare has the funding that it needs.").

as mandated by Section 111. This failure is either due to insurers, including the Defendants, having flawed systems and faulty data or represents a purposeful effort by them to hide the insurers' primary status from Medicare and MAOs. Without a proper Section 111 report, Medicare—and ultimately MAOs—frequently do not know that they are secondary payers and do not know who the primary payer is.

11.     The auto insurers' strategies, including those of the Defendants, have harmed and will continue to harm Medicare and MAOs across the country. The Ninth Circuit in *DaVita Inc. v. Virginia Mason Mem'l Hosp.*, 981 F.3d 679, 692 (9th Cir. 2020), observed: "It may seem implausible today that [an insurance] plan would blatantly contradict the MSP by asserting that Medicare must pay first. But we note that, for decades, the sole purpose of the MSP was to require private plans to pay first—a requirement that insurers resisted and that Congress struggled to enforce." Even now, insurers like the Defendants continue to resist.

12.     For that reason, this action seeks to enforce the MSP Act through the Act's private cause of action—enacted specifically to overcome insurers' resistance—by requiring the Defendants to do what the MSP Act Mandates: identify and reimburse conditional payments made by one of the largest MAOs in the country when Defendants were the primary payer. That MAO ("the MAO assignor") assigned its conditional payment recovery rights to Plaintiff to bring this action.

## PARTIES, JURISDICTION AND VENUE

13.     Plaintiff Series 15-09-321 is a Delaware series limited liability company with a principal place of business located at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134. Series 15-09-321 is the ultimate assignee of the MAO Assignor's rights to recovery.

14.     Defendant Progressive Corporation is a company that issues liability and no-fault

insurance policies, with its principal place of business at 6300 Wilson Mills Rd. Mayfield Village, Ohio 44143. On information and belief, Progressive Corporation does business under Progressive Insurance.

15.     Defendant Progressive American Insurance Company is a company that issues liability and no-fault insurance policies, with its principal place of business at 6300 Wilson Mills Rd. Mayfield Village, Ohio 44143.

16.     Defendant Progressive Select Insurance Company is a company that issues liability and no-fault insurance policies, with its principal place of business at 6300 Wilson Mills Rd. Mayfield Village, Ohio 44143.

17.     Defendant Progressive Direct Holdings, Inc. is a company that issues liability and no-fault insurance policies, with its principal place of business at 6300 Wilson Mills Rd.  Mayfield Village, Ohio 44143.

18.     Defendant Progressive Casualty Insurance Company is a company that issues liability and no-fault insurance policies, with its principal place of business at 6300 Wilson Mills Rd. Mayfield Village, Ohio 44143.

19.     Defendant Progressive Classic Insurance is a company that issues liability and no-fault insurance policies, with its principal place of business at 6300 Wilson Mills Rd., Mayfield Village, Ohio 44143.

20.     Defendant Progressive Northwestern Insurance Company is a company that issues liability and no-fault insurance policies, with its principal place of business at 6300 Wilson Mills Rd., Mayfield Village, Ohio 44143.

21.     Defendant Progressive Advanced Insurance Company ("Progressive Advanced") is a company that issues liability and no-fault insurance policies, with its principal place of business

at 6300 Wilson Mills Rd., Mayfield Village, Ohio 44143.

22.     Defendant Progressive Hawaii Insurance Corporation is a company that issues liability and no-fault insurance policies, with its principal place of business at 6300 Wilson Mills Rd., Mayfield Village, Ohio 44143.

23.     Progressive Claims Management is a company that issues liability and no-fault insurance policies, with its principal place of business at 6300 Wilson Mills Rd., Mayfield Village, Ohio 44143.

24.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question).

25.     Venue is proper under 28 U.S.C. § 1391 in the United States District Court for the Northern District of Ohio because it is the district in which the cause of action accrued.

26.     This Court has personal jurisdiction over Defendants as Defendants are authorized and licensed to conduct business in Ohio, maintain and carry on systematic and continuous contacts in this judicial district, regularly transact business within this judicial district, and regularly avail themselves of the benefits in this judicial district.

27.     All conditions precedent to this action have occurred, been performed, or have been waived, including meeting any purported threshold amount to the applicable.

## THE MEDICARE ADVANTAGE PROGRAM

28.     Medicare enrollees may elect to receive their benefits in one of two ways. First, they may receive their benefits under the traditional Medicare Parts A and B. Known as the Medicare "fee for service" option Parts A and B provide hospital insurance and coverage for medically necessary outpatient and physician services. 42 U.S.C. § 1395w-21(a)(1)(A). Under Parts A and B, government contractors pay for Medicare enrollees' expenses directly on a fee-for-

service basis. Alternatively, under Medicare Part C, Medicare enrollees may receive their Medicare benefits from private health insurers called Medicare Advantage Organizations or MAOs. 42 U.S.C. § 1395w-21(a)(1)(B).

29.     Congress enacted the Part C "Medicare Advantage" option in 1997 after experts had come to realize that the Parts A and B "fee for service" payment structure encouraged healthcare providers to order more tests and procedures than medically necessary. Through Medicare Advantage, Congress intended to "enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options." H.R. Rep. No. 105-217, at 585 (1997) (Conf. Rep.).

30.     Each MAO contracts individually with the Secretary of Health and Human Services. 42 U.S.C. § 1395w-27. Under that contract, the MAO receives a fixed amount per enrollee based on the plan's enrollees' risk factors and other characteristics rather than payment of a fee for specific services performed. The MAO must then provide at least the same level of benefits that enrollees would receive under the fee-for-service Medicare Plan A and B option. *See id.* at § 1395w-22. By paying MAOs a fixed amount per enrollee—called a "capitation" payment system—Congress sought to safeguard public dollars while improving the quality of care.

31.     Under a capitation-based system, the MAO provides Medicare benefits in exchange for the fixed monthly fee per person enrolled in the program regardless of actual healthcare usage. MAOs are thus incentivized to provide health insurance more efficiently than under the fee-for-service model. Not only does the Medicare Advantage program stimulate cost savings for the Medicare Trust Fund, but it also promotes creation of additional benefits for Medicare-eligible individuals: "[C]ost savings for the Medicare Trust Fund was not Congress's only goal when it created the MA program. Congress structured the program so that MAOs would compete for

enrollees based on how efficiently they could provide care to Medicare-eligible individuals." *In re Avandia*, 685 F.3d at 365.

32.     Achievement of Congress's goals in enacting Medicare Advantage is, however, dependent on MAOs being able to achieve cost savings—like Medicare—through enforcement of the MSP Act by ensuring primary payers, such as the Defendants in this case, have reimbursed the MAOs for payments of medical expenses that should have been paid by the insurers who charged premiums specifically to cover those expenses. *In re Avandia*, 685 F.3d at 363. When MAOs achieve cost savings by recovering conditional payments from primary payers, they can bid to cover Medicare-eligible individuals at an amount lower than CMS's benchmark, which then allows CMS to deposit part of the savings into the Medicare Trust Fund. The MAOs' which then allows CMS to deposit part of the savings into the Medicare Trust Fund. The MAOs' cost savings also allow MAOs to offer "additional benefits to enrollees not covered by traditional Medicare." *Id.* at 365. While conditional payments recovered by MAOs do not go to Medicare directly, the payments by primary payers do reduce costs, and those savings are passed on to Medicare through reduced costs or to the beneficiaries through expanded services. *See* 42 U.S.C. § 1395w-23.

33.     Even though MAOs have parity of recovery rights with Medicare, insurers such as the Defendants have—for more than two decades—continued to disregard their reimbursement obligations to MAOs. That failure, which blocks achievement of Congress' cost-saving goals, depletes the Medicare Trust Funds that support Medicare Advantage under Part C—the same funds supporting traditional Medicare under Parts A and B. 42 U.S.C. § 1395w-23(f). Consequently, Congress's mandate that Medicare shall not be the entity primarily footing the bill is still a long way from being realized. Litigation, such as this, "ensuring that MAOs can recover from primary payers efficiently with a private cause of action for double damages does indeed advance the goals

of the MA program." *In re Avandia*, 685 F.3d at 365.

34.    Achievement of Congress's goals in enacting Medicare Advantage is, however, dependent on MAOs being able to achieve cost savings—like Medicare—through enforcement of the MSP Act by ensuring primary payers, such as the Defendants in this case, have reimbursed the MAOs for payments of medical expenses that should have been paid by the insurers who charged premiums specifically to cover those expenses. *In re Avandia*, 685 F.3d at 363. When MAOs achieve cost savings by recovering conditional payments from primary payers, they can bid to cover Medicare-eligible individuals at an amount lower than CMS's benchmark, which then allows CMS to deposit part of the savings into the Medicare Trust Fund. The MAOs' which then allows CMS to deposit part of the savings into the Medicare Trust Fund. The MAOs' cost savings also allow MAOs to offer "additional benefits to enrollees not covered by traditional Medicare." *Id.* at 365. While conditional payments recovered by MAOs do not go to Medicare directly, the payments by primary payers do reduce costs, and those savings are passed on to Medicare through reduced costs or to the beneficiaries through expanded services. *See* 42 U.S.C. § 1395w-23.

35.    Even though MAOs have parity of recovery rights with Medicare, insurers such as the Defendants have—for more than two decades—continued to disregard their reimbursement obligations to MAOs. That failure, which blocks achievement of Congress' cost-saving goals, depletes the Medicare Trust Funds that support Medicare Advantage under Part C—the same funds supporting traditional Medicare under Parts A and B. 42 U.S.C. § 1395w-23(f). Consequently, Congress's mandate that Medicare shall not be the entity primarily footing the bill is still a long way from being realized. Litigation, such as this, ensures that MAOs can recover from primary payers efficiently to reach the goals of the MA program.

36.     This litigation seeks to reconcile, in an accurate, structured, and equitable way, claims for reimbursement Defendants have owed for years to the MAO Assignor. This litigation thus effectively implements Congress's original intent in passing the MSP Act.

**DEFENDANTS' DUTIES TO REPORT PRIMARY PAYER OBLIGATIONS**

37.     Defendants are property and casualty insurers in the business of collecting premiums in exchange for taking on the risk that they will have to pay for personal and property damage resulting from covered events. Collectively, Defendants offer insurance products in all 50 states and the District of Columbia that have inevitably given rise to an MSP Act obligation to repay conditional payments made by Plaintiff's MAO Assignor in those states. As a result, Defendants are tasked with having the proper systems in place to be able to (a) identify Medicare beneficiaries making claims under Defendants' policies and (b) properly report them to CMS under section 111 as required by law.

38.     Defendants underwrite automobile liability policies that include first-party and third-party medical coverage. A first-party insurance policy referred to the policy of the injured person. A third-party insurance policy refers to the property and bodily injury policy covering the person or entity who was responsible for the automobile accident. First-party medical coverage includes Personal-Injury-Protection ("PIP") policies that are usually issued pursuant to a state no-fault statute or provide Medical Payments Coverage ("MedPay") found in a first-party policy. The first-party policy can also, and in most instances does, contain bodily injury coverage. Third-party coverage includes coverage under a third-party liability policy and coverage under the uninsured motorist and/or underinsured motorist coverage provisions of a first-party insurance policy. This coverage pays for medical expenses arising out of an automobile accident that was the fault of a third party where the third party has no coverage or insufficient coverage to pay the claims of the

injured party.

39.     Defendants have primary payer obligations under the MSP Act to reimburse MAOs such as Plaintiff's MAO Assignor for medical expenses arising out of an automobile accident involving a Medicare beneficiary in three general situations involving both first-party and third-party policies:

(1)     **Contractual**: When Defendants have a contractual obligation to pay under a first-party policy such as for PIP or MedPay;

(2)     **Settlement**: When Defendants settled a bodily injury claim made against a third party under either a third-party liability policy or under the uninsured or underinsured motorist coverage provisions of a first-party policy; and

(3)     **Hybrid Situations**: Where an accident renders Defendants a primary payer under both a contractual and a settlement-based obligation, such as where an auto accident gives rise to claims under both first-and third-party insurance policies.

A.     **First Party Policy Claims: First-Party Policy Medical Coverage**

40.     Defendants are primary payers when they have issued an insurance policy that provides for first-party medical coverage that pays the reasonable and necessary medical expenses that an insured (or a passenger) incurred due to injuries sustained in an accident, regardless of fault. 42 U.S.C. § 1395y(b)(2)(A). The type of first-party medical coverage varies state by state. Some states require PIP coverage while other states provide optional MedPay coverage. A few states have both PIP and MedPay available.

41.     Although subject to change among the years at issue (and by no means exhaustive), the following states currently have no-fault statutes requiring mandatory PIP coverage:

- **Florida:** Florida Statute § 627.736 requires a minimum of $10,000.00 in no-fault medical benefits per person;

- **Hawaii:** Hawaii Revised Statutes § 431:10C-103.5 requires a minimum of $10,000.00 in no-fault medical benefits per person;

- **Kansas:** Kansas Statutes § 40-3103 requires a minimum of $4,500.00 in no-fault medical benefits per person;

- **Kentucky**: Kentucky Revised Statute § 304.39-020 requires a minimum of $10,000.00 in no-fault medical benefits per person;

- **Massachusetts**: Massachusetts General Laws 90 § 34A requires a minimum of $8,000.00 in no-fault benefits per person;

- **Michigan**: Michigan Compiled Laws § 500.3107 requires mandatory no-fault coverage at an amount to be selected by the insured;

- **Minnesota**: Minnesota Statutes § 65B.44 requires a minimum of $40,000.00 in no-fault medical benefits per person;

- **New Jersey**: New Jersey § 39:6A-4.3 requires a minimum of $15,000.00 in no-fault medical benefits per person;

- **New York**: 28 Consolidated Laws of New York § 5102 requires a minimum of $50,000.00 in no-fault benefits per person;

- **North Dakota**: North Dakota Century Code § 26.1-41-01 requires a minimum of $30,000.00 in no-fault benefits per person;

- **Pennsylvania**: 75 Pennsylvania Consolidated Statutes § 1711 requires a minimum of $5,000.00 in no-fault medical benefits per person; and

- **Utah**: Utah Code § 31A-22-307 requires a minimum of $3,000.00 in no-fault benefits per person;

42.    In addition, although Oregon is not a no-fault state, it requires $15,000.00 per person in PIP medical benefits.

43.    In the remaining states (other than Oregon) that are considered "at-fault" states because they do not have mandatory no-fault coverage, insureds in some states have the option to purchase PIP coverage or some form of medical payments coverage (such as in Arkansas, Maryland, South Dakota, Texas, Virginia, and Washington). In all other states, they may purchase MedPay, which also pay medical benefits regardless of who was at fault in the accident. MedPay is mandatory in Maine ($2,000.00 in medical benefits) and in New Hampshire if the New Hampshire resident purchases auto insurance, which is not mandatory ($1,000.00 in medical benefits). In addition, Pennsylvania allows individuals to opt out of no-fault insurance in which

case the insured must purchase $5,000.00 in MedPay coverage.

44.     For purposes of this Complaint, "First Party Policy Claims" will refer to those instances in which the MAO Assignor made accident-related conditional payments on behalf of a Medicare beneficiary that was also an insured under a first-party policy that provided medical payments regardless of fault such as PIP or MedPay.

**B.     Settlement Claims: Third-Party Bodily Injury Coverage Where Defendants Settled A Liability Claim**

45.     When a Medicare beneficiary is injured in an accident that is the responsibility of a third party, Defendants may be the insurer of the third party or may be responsible under the Medicare beneficiary's own policy by virtue of uninsured or underinsured motorist bodily injury policies ("UM" and "UIM" policies). Defendants have no obligation to pay benefits under the third-party policy or the UM/UIM policies unless the third party was "at fault."

46.     Although the most common types of policies where third-party liability claims arise are bodily injury liability policies or UM/UIM policies, third-party liability policies can also include umbrella coverage, which are policies that may include coverage for medical expenses that the insured is legally obligated to pay in excess of no-fault or medical-payments coverage, bodily injury policy limits, or UM/UIM coverage.

47.     Under any of these policies, if Defendants choose to settle the Medicare beneficiary's claims, including medical expenses, arising out of the accident for which the third party was responsible or if a judgment or arbitration award is entered in the Medicare beneficiary's favor with respect to claims covered by Defendants' policy, then the Defendants are the responsible primary payer under the MSP Act.

48.     For purposes of this Complaint, "Settlement Claims" refers to those instances when the MAO Assignor made accident-related conditional payments on behalf of a Medicare

beneficiary who made a claim either against a third-party liability policy or under the beneficiary's own UM/UIM coverage, and Defendants' compromised that claim through a settlement, including settlements arising out of a judgment or arbitration award or otherwise made a payment that would be the functional equivalent of a settlement or judgment to cover medical expenses incurred as a result of a specific incident or accident.

### C.   Defendants' Obligations Once They Become a Primary Payer

49.    For both "First Party Policy Claims" and "Settlement Claims," Defendants are charged with two duties under the MSP Act: (1) to report its primary payer status under Section 111, and (2) to reimburse Medicare within 60 days of receiving a primary payment. The primary plan "must reimburse Medicare even though it has already reimbursed the beneficiary or other party." 42 U.S.C. § 1396y(b)(2)(B)(ii); 42 C.F.R. § 411.24(i)(1). If Defendants fail to reimburse within 60 days, the MSP Act automatically gives rise to a right to bring an action such as this one. In conjunction with these two duties, it is also a Primary Payer's obligation to identify its beneficiaries who are simultaneously Medicare beneficiaries in order to report and reimburse in accordance with the MSP Act.

50.    Section 111 amended the MSP Act to aid Medicare in the detection of alternative sources of insurance coverage by requiring primary plans—on their own initiative—to "determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under the program under this subchapter on any basis"—i.e., including under Medicare Advantage—and "if the claimant is determined to be so entitled," to report the claim to the Secretary. 42 U.S.C. § 1395y(b)(8)(A)-(C).

51.    The insurer's Section 111 report must provide "notice about [its] primary payment responsibility and information about the underlying MSP situation" to the Medicare payer. 42

C.F.R. § 411.25.

52.     "The notice must describe the specific situation and the circumstances (including the particular type of insurance coverage as specified in § 411.20(a)) and, if appropriate, the time period during which the insurer is primary to Medicare." *Id.* 42 C.F.R. § 411.25(a)-(c).

53.     Consequently, to submit a Section 111 report, an auto insurer like Defendants must obtain certain data from the individuals making first- and third-party insurance claims. The data that must be obtained and reported includes:

- Medicare Beneficiary Information:

  - Beneficiary name, address, sex, and date of birth
  - Beneficiary health insurance claim number (i.e. Medicare beneficiary identification number or "HIC" number)
  - Social security number (if known)

- Medicare Claim Information

  - Date of accident, injury, or illness
  - Provider of service
  - Amount of Medicare payment (if known)
  - Date of Service
  - Date of Medicare payment (if known)

- Insurer, Employer, or Administrator Information:

  - Policyholder name and address
  - Name and address of insurer or administrator
  - Policy identification number or other identifier
  - Individual case identifiers used by third party payer (if applicable)
  - Name and phone number of insurer or administrator contact person
  - Workers' compensation agency claim number (if applicable)
  - Court case or docket numbers (if applicable)
  - Beneficiary's attorney's name, address, and phone number (if known and applicable)
  - Name, address, and phone number of employer
  - Date and amount of payment made by the insurer (specify whether undisputed payment, settlement of disputed claim, or judgment)
  - Whether, under the plan of insurance, payment was considered to be a primary or secondary payment
  - Payee name and address

*Medicare Program; Medicare Secondary Payment,* 59 Fed. Reg. 4285-01, 4287 (Jan. 31, 1994).

54.     More specifically, where Defendants accept coverage under a first-party insurance policy—such as for PIP or MedPay coverage—Defendants have what is called an Ongoing Responsibility for Medicals ("ORM"). ORM is an entity's "responsibility to pay, on an ongoing basis, for the injured party's (the Medicare beneficiary's) 'medicals' (medical care) associated with a claim. Typically, ORM only applies to no-fault and workers' compensation claims." CMS Section 111.1 NGHP User Guide, Chapter III, Policy Guidance, Version 7.0, Chapter 2: Introduction and Important Terms; *see also* Chapter 6: Responsible Reporting Entities § 6.3.

55.     On the other hand, when Defendants settle an accident-related claim based on third-party liability with someone entitled to Medicare benefits, it has what is called a Total Payment Obligation to the Claimant ("TPOC"). The CMS Section 111 NGHP User Guide states that a TPOC "refers to the dollar amount of a settlement, judgment, award, or other payment in addition to or apart from ORM. A TPOC generally reflects a 'one-time' or 'lump-sum' settlement, judgment, award, or other payment intended to resolve or partially resolve a claim. It is the dollar amount of the total payment obligation to, or on behalf of the injured party in connection with the settlement, judgment, award, or other payment." Chapter III: Policy Guidance, Version 7.0, Chapter 2: Introduction and Important Terms; *see also* Chapter 6: Responsible Reporting Entities § 6.4.

56.     When Defendants have either ORM or TPOC, it is a "Responsible Reporting Entity" or "RRE" under federal law and are required to submit a Section 111 report. To submit the report, Defendants must first query the Medicare eligibility database to determine whether the claimant is a Medicare beneficiary. CMS's Benefits Coordination & Recovery Center ("BCRC") gives reporting entities two query methods. Because of Defendants' size, they must submit

requests using a "Query Input File" that will be answered in fourteen days.

57.     When uploading a Query Input File with the BCRC to determine whether a claimant is a Medicare beneficiary, the query record submitted for each claimant must contain five data elements related to the claimant: (1) Social Security Number ("SSN") or Medicare ID; (2) the first 6 characters of the claimant's last name; (3) the first initial of the claimant's first name; (4) the claimant's date of birth; and (5) the claimant's gender. Names must be submitted exactly as they appear on the individual's Social Security or Medicare card, including spaces, hyphens, and apostrophes. *Id.* at 26.

58.     These five pieces of information are *required* to determine a claimant's entitlement to Medicare benefits and must be gathered by Defendants for submission to the BCRC.[5] CMS requires all five of the data elements because "the matching process depends on the quality of the data submitted. It is difficult to get a match if the input data is incorrect or invalid."[6]

59.     For the BCRC to find a match in the Medicare database, there must be an exact match on either: (1) the Medicare ID or the full SSN, and three out of the four remaining fields; or (2) the partial SSN (last five digits) and all four remaining fields. Thus, when fewer than three out of the last four criteria match (i.e., the first initial of the first name, first six characters of the last name, date of birth, and gender), the RRE will not receive a match even if the submitted Medicare ID or SSN in fact matches that of a Medicare beneficiary.

60.     If that claimant is indeed a Medicare beneficiary, Defendants must provide Section 111 report to CMS "*after* the claim is resolved [by Defendants] through a settlement, judgment, award, or other payment (regardless of whether or not there is a determination or admission of

---

[5] CMS, MMSEA Section 111 Liability Insurance (including Self-Insurance), No-Fault Insurance, and Workers' Compensation, Query File, January 9, 2023, page 23.
[6] *Id.* at 25.

liability)." 42 U.S.C. § 1395y(b)(8)(A)(ii) (emphasis added). In other words, once Defendants enter into a settlement with or make a payment to or on behalf of a Medicare-eligible beneficiary (and not before), it must file the mandatory Section 111 report.

61.     By making a payment on behalf of or entering into a settlement with a Medicare beneficiary in connection with the Medicare beneficiary's accident-related claim, Defendants demonstrate it is the "primary plan" as to that claim. A primary plan must reimburse Medicare or MAOs for their conditional payments when it is demonstrated that the primary plan has or had responsibility to make payment with respect to such item or service, a primary plan's responsibility for payment may be shown by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured.

## DEFENDANTS' FAILURE TO COMPLY WITH THE MSP ACT

62.     For numerous years, and continuing through the present, Defendants' have failed to comply with its duty to gather the necessary information from the claimants to enable it to submit all the required data elements to CMS so that it can identify for Defendants those claimants entitled to Medicare benefits. This habitual failure frequently results in Defendants making no Section 111 submission at all. When Defendants fail to make a Section 111 report, Medicare and MAOs do not have the requisite information needed to identify a primary payer and to seek reimbursements for conditional payments.

63.     Upon information and belief, Defendants track their compliance with Section 111 through periodic audits conducted to evaluate their success at collecting and submitting complete data sets for claimants.

64.     Upon information and belief, the audit reports show Defendants fail to consistently comply with Section 111. Upon further information and belief, those reports are shared with Defendants' upper management and establish Defendants' knowledge that they do not fully comply with their duties to identify Medicare beneficiaries and, as a result, fail to reimburse claims conditionally paid by Medicare or MAOs.

65.     Defendants' failure to obtain the necessary data points to determine a claimant's Medicare eligibility, whether intentional or unintentional, results in significant under-reporting and, correspondingly, the inability of Medicare or MAOs to uncover all the instances in which Defendants owe reimbursement of conditional payments. Defendants are aware of their obligations under the MSP Act to "determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under the program bunder this subchapter on any basis," and has access to the necessary data to make this determination. In fact, in most instances, Defendants have the requisite data points in their systems to make this determination and report their primary payer status pursuant to Section111 and, to the degree they do not, are aware of their affirmative statutory duty to obtain that information.

66.     Upon information and belief, Defendants fail to properly report hundreds of reimbursable claims nationwide. Plaintiff compared the claims data it received from its MAO Assignor to publicly available motor vehicle accident reports to identify instances where Medicare beneficiaries appear to have been involved in crashes. Plaintiff then took that pool of beneficiaries and compared them to Section 111 reports made by Defendants. Upon completion of that comparison, there are numerous instances where, upon information and belief, it appears Defendants either completely failed to report reimbursable claims or withdrew a prematurely filed report.

## DEFENDANTS' FAILURE TO COORDINATE BENEFITS OR COOPERATE WITH PLAINTIFF'S ATTEMPT TO COORDINATE BENEFITS

67.     Even though Defendants, as a primary payer, bear the responsibility for coordinating benefits and identifying whether Medicare or any MAO is entitled to reimbursement of conditional payments, Plaintiff attempted, prior to bringing this lawsuit, to work with Defendants to identify conditional payments made by Plaintiff's MAO Assignor that Defendants should have reimbursed. Plaintiff, through its servicer, sent out coordination of benefits letters via certified mail to Defendants and devoted a tremendous amount of manpower and resources to try to work with Defendants to resolve each letter. The letters related to both First Party Policy Claims and Settlement Claims.

68.     Plaintiff identified Defendants as the likely primary payer for the conditional payments reflected in these letters based on reports that Defendants made under Section 111. Plaintiff accesses the Section 111 reports through a CMS-authorized vendor called MyAbility. MyAbility's data is drawn directly from data submitted by Defendants to CMS, either itself or through a reporting vendor Defendants hired. Accordingly, any inaccuracy or lack of specificity in the data is attributable to Defendants.

69.     Defendants, thus far, have responded to 1072 letters, attaining a 52.7% response rate. For those letters that did get responses, Defendants either refused to provide any information that would allow the parties to coordinate benefits as the law requires, or Defendants have denied that it had any responsibility based on purported legal defenses that have no basis in law or fact.

70.     For the First-Party Policy Claims, Plaintiff attempted to coordinate benefits for at least 1424 instances in which Defendants reported under Section 111 having made a payment based on the existence of a first-party insurance policy.  Those claims corresponded with payments

made by Plaintiff's MAO Assignor on behalf of Medicare beneficiaries that resided in 38 different

states. The top 10 states with the number of claims made in those states are as follows:

| First Party Claims | |
|---|---|
| State | Count |
| FL | 683 |
| NY | 319 |
| GA | 48 |
| TX | 44 |
| PA | 31 |
| OH | 27 |
| WI | 27 |
| AL | 23 |
| NC | 23 |
| UT | 20 |

71. For the Settlement Claims, Plaintiff attempted to coordinate benefits for 610

instances in which Defendants acknowledged in a Section 111 filing that it had entered into a

settlement with Medicare beneficiary enrolled with the MAO Assignor under a third-party

insurance policy or UM/UIM. Those claims corresponded with payments made by Plaintiff's

MAO Assignor Plan on behalf of Medicare beneficiaries that resided in 41 different states. The

top 10 states with their total number of beneficiaries are as follows:

| Third Party Claims | |
|---|---|
| State | Count |
| FL | 111 |
| GA | 61 |
| MO | 40 |
| TX | 37 |
| SC | 35 |
| NY | 25 |
| TN | 25 |
| WI | 24 |
| CO | 22 |
| OH | 21 |

72.     Plaintiff devoted significant resources in its attempt to coordinate benefits with Defendants and to avoid litigation. Plaintiff has no choice but to bring this action because its comprehensive and exhaustive efforts to coordinate and work with the Defendants outside of litigation have been unsuccessful. In fact, in their responses to Plaintiff's correspondence, Defendants have habitually stonewalled Plaintiff's effort to coordinate benefits with improper defenses to properly compensable claims. The table below summaries Defendants' responses to Plaintiff's efforts to coordinate benefits:

| | |
|---|---|
| Contesting MSP Assignment & Failed To Provide Assignment of Benefits | 1455 |
| Failed to attach itemized bill | 982 |
| Failed to provide proper claim-policy number | 923 |
| Refuse to Access Portal | 685 |
| Unable to Locate Claim-Insured | 672 |
| General Insurance Correspondence | 152 |
| Response to MSPSCO | 131 |
| Re-Requesting Itemized Bill | 90 |
| Confirmed Settlement | 85 |
| Requesting Medical Records | 82 |
| Statute of Limitations | 82 |
| Requesting MSP Assignment of Recovery Rights | 78 |
| Re-Requesting Assignment | 73 |
| Disclosed Beneficiary Attorney | 69 |
| Exhaustion | 60 |
| E2MSP Reply | 49 |
| Response to MSP Follow-Up | 48 |
| Member Not Covered | 29 |
| Subrogation (Paid Lien) | 21 |
| Third Party Insurer Did Not Accept Liability | 20 |
| Allege State Law SOL Applies | 17 |
| Received Full Payment | 17 |
| Received Partial Payment | 17 |
| Received Response to MSP Demand | 17 |
| Contesting Relatedness | 15 |

| | |
|---|---|
| Requested CMS-UB Forms | 14 |
| Subro Closing Notification | 14 |
| Response to MSPIR | 13 |
| Requesting Evidence That Beneficiary is a MA Plan Enrollee | 12 |
| E2MSP Follow-up | 8 |
| Primary Payer made payment | 8 |
| Provided CMS Information | 7 |
| Beneficiary did not report injuries | 6 |
| Failed to send to proper address | 6 |
| Requested W-9 | 6 |
| Contact Attorney Only | 4 |
| Disclosed First Party Insurer | 4 |
| Privileged Communication | 4 |
| Different Date of Accident | 3 |
| E2MSP Reviewed Itemized Bill | 3 |
| Contesting Billed Amount | 2 |
| Disclosed Third Party Insurer | 2 |
| First Party Insurer made payment | 2 |
| Recalled Emails | 2 |
| Requesting Settlement Agreement | 2 |
| Third Party Insurer Claim Open | 2 |
| Unable to Access Portal | 2 |
| Accepting Settlement Offer | 1 |
| First Party Insurer Claim Open | 1 |
| Ins Company Allege Not Medicare Beneficiary | 1 |
| Out of State Policy | 1 |
| Possible Double-Dipping | 1 |
| Primary Payer is Reviewing Claims | 1 |
| Refusing Settlement Offer | 1 |
| Requested Additional Extension Past 30 Days | 1 |
| Requesting Extension | 1 |
| Settlement Negotiation | 1 |

73.     Defendants also refused to share any data with Plaintiff for the purpose of identifying situations where Defendants were a primary payer but did not submit a Section 111 report—a process that numerous other carriers have agreed to explore outside of litigation.

Defendants' actions in refusing to coordinate benefits are purposeful and designed to continue to conceal details of its primary payer responsibility when it has failed to submit a Section 111 report.

74.     Through this action, Plaintiff seeks to identify all instances in which Defendants had a primary payer responsibility to reimburse accident-related conditional payments made by Plaintiff's MAO Assignor. The most efficient and fair way to quantify those damages is through a process that resembles what several other carriers are already doing voluntarily. To identify undetected claims for primary payers *other than* Defendants, Plaintiff has engaged in data sharing exercises with those other primary payers, who are also property and casualty insurers, in which the parties match data to identify all the instances in which a MAO made payments that overlap with first- or third-party claim made to the insurer by a Medicare beneficiary enrolled with the MAO. This process uses matching techniques that compensate for missing data and data imperfections and is consistent with Congress's intention in enacting the MSP Act to ensure that Medicare and, ultimately, MAOs (Part C plans) are repaid in *all instances* where an insurer is primary.[7]

---

[7] *See, e.g.,* **(1) Allstate Insurance Company** (*MSPA Claims 1, LLC v. Allstate Ins. Co.*, Case No. 1:17-cv-01340, D.E. 169 (N.D. Ill. Mar. 8, 2022)) (no-fault settlement exploration through data sharing; *MSP Recovery Claims 1, LLC v. Allstate Ins. Co.*, Case No. 20-cv-24140 at Dkt. No. 70 (S.D. Fla. 2020)) (bodily injury settlement exploration through data sharing), **(2) Auto-Owners Insurance Company** (*MSP Recovery Claims, Series LLC v. Auto-Owners Ins. Co.*, Case No. 17-cv-23841 at Dkt. No. 143 (S.D. Fla. 2022)) (settlement exploration through data sharing and noting in the joint report requesting dismissal that "[t]he parties believe that the best opportunity to finally resolve their disputes will be to continue engaging in a data matching process agreed to by the parties" and "this exercise is a reconciliation that be handled by the parties outside of litigation"); **(3) National General Insurance Company** (*MSP Recovery Claims, Series LLC, et al. v. Integon Nat. Ins. Co., et al.*, Case No. 20-cv-24051, D.E. 147 (S.D. Fla. 2022)) (settlement exploration through data sharing), **(4) Sentry Insurance Company** *MSP Recovery Claims, Series LLC v. Dairyland Ins. Co.*, Case No. 17-cv-23983 at Dkt. No. 91 (S.D. Fla. 2020)) (no-fault and bodily injury settlement exploration through data sharing); **(5) Grange Insurance Company** (*MSP Recovery Claims, Series LLC v. Grange Ins. Co.*, Case No. 19-cv-219 at Dkt. No. 36 (N.D. Ohio 2019)) (noting in joint report that Grange agreed to "engage in a defined claims data matching

**STANDING ALLEGATIONS**

A.    **Assignment Allegations**

75.    Plaintiff has the legal right to pursue its MSP Act claim pursuant to a valid assignment agreement.[8]

76.    On December 23, 2021, Plaintiff's MAO Assignor entered into a Claims Assignment Agreement with Series 15-09-321, whereby the MAO Assignor irrevocably assigned all rights to recover payments made on behalf of its members/enrollees (the "2021 Assignment Agreement"). The 2021 Assignment Agreement expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee any and all of Assignor's right, title, ownership, and interest in Medicare Advantage Parts A, B, and C payments owed by Responsible Parties pursuant to the MSPA, by and through the following causes of action: (1) actions stemming from the MSPA; (2) breach of contract; (3) pure bills of discovery or equivalent; (4) depositions or discovery before action as set forth by Federal Rule of Civil Procedure 27; (5) subrogation; (6) declaratory action; (7) unjust enrichment, whether known or unknown, or arising in the future (the "Claims").

2021 Assignment Agreement at 1.1.1.

77.    Consideration was exchanged by the parties in executing the 2021 Assignment and

---

process" to explore settlement, which resulted in a global settlement); **(6) Esurance Insurance Services, Inc** (*MSP Recovery Claims Series, LLC v. Esurance Property and Casualty Co.*, Case No. 20-cv-23590 at Dkt. No. 50 (S.D. Fla. 2020)) (no-fault and bodily injury settlement exploration through data sharing); **(7) Amica Mutual Insurance Company** (*MSP Recovery Claims, Series LLC v. Amica Mut. Ins. Co.*, Case No. 20-cv-24050, D.E. 42 (S.D. Fla. May 6, 2022)) (settlement exploration through data sharing); **(8) Horace Mann Insurance Company** *MSP Recovery Claims, Series LLC v. Horace Mann Ins. Co.*, Case No. 20-cv-24419, Dkt. No. 40 (S.D. Fla. July 9, 2021)) (global settlement reached based on data sharing); **(9) 1199 SEIU National Benefit and Pension Funds** (*MSP Recovery, LLC v. 1199 SEIU Nat'l Benefit and Pension Funds*, Case No. 20-cv-1480) (global settlement reached following data sharing).

[8] A separate data service agreement with Plaintiff's MAO Assignor contains a provision requiring that the identity of the Assignor remain confidential. Accordingly, Plaintiff has omitted the name of its assignor from this Complaint. Accordingly, Plaintiff has omitted the name of its assignor from this Complaint. Should the Court deem it necessary, Plaintiff will disclose its MAO Assignor's identity, but would request that the identity be disclosed under seal.

the data service agreement.

78.     The "Claims" expressly exclude claims where the MAO Assignor already recovered on the claim or is currently pursuing the claim.

79.     The MAO Assignor transferred data files to Plaintiff indicating those claims where it already had recovered money and those claims where the MAO Assignor is still pursuing recoveries. Plaintiff reviewed that list prior to filing this case and conferred with the Assignor, in an abundance of caution, to confirm that the assignor (1) never recovered money for the examples set forth below and (2) is not pursuing recoveries for the examples below. Accordingly, these examples remain unpursued and unreimbursed, and not excluded, and Plaintiff have the legal right to pursue these claims.

80.     The claims set forth in this Complaint are not subject to any carveout, exclusion, or any other limitation in law or equity that would impair Plaintiff's right to bring the claim asserted in this case.

81.     This Complaint seeks recovery only for claims Plaintiff's assignor has assigned to Plaintiff through its Designated Series (Series 15-09-321). All claims at issue in this Complaint, and all claims data currently in Plaintiff's possession, were assigned to Plaintiff through the 2021 Assignment Agreement. Indeed, Plaintiff has possession of the electronic claims data for each example of non-reimbursement identified in this Complaint solely because Plaintiff's Assignor provided that data to Plaintiff pursuant to the 2021 Assignment Agreement.

**<ins>Examples Of Unreimbursed First Party Policy Party Claims</ins>**
**<ins>And Settlement Claims</ins>**

82.     Defendants, by failing to comply with the MSP Act and reimburse Plaintiff's MAO Assignor for conditional payments, has caused monetary injury to Plaintiff's MAO Assignor sufficient to establish a concrete injury in fact under Article III. Despite very little cooperation

from Defendants, Plaintiff has identified from data transferred to it by the MAO Assignor and further investigation several examples of Defendants' failure to comply the MSP Act.

83.     Adhering to how CMS identifies instances of non-reimbursed conditional payments, Plaintiff analyzed the MAO Assignor's enrollment and claims data to identify situations where: (1) the MAO Assignor had a Medicare beneficiary enrollee injured in an accident, (2) Defendants filed a Section 111 report regarding that enrollee, (3) the MAO Assignor made accident-related payments on behalf of that enrollee, and (4) Defendants failed to reimburse the MAO Assignor's conditional payments. Plaintiff confirmed that Defendants either acknowledged that the enrollee was covered by Defendants or that Defendants had entered into a settlement with the enrollee arising out of the accident.

84.     Specifically, CMS uses what is reported through Section 111 to identify whether any claims that Medicare either receives or pays are related to an automobile accident. https://www.cms.gov/files/document/mmsea-111-august-7-2023-nghp-user-guide-version-73-chapter-iv-technical-information.pdf at Section 6.2.5 (last visited October 5, 2023). CMS requires the Section 111 report to contain certain codes (called International Classification of Diseases, Ninth/Tenth Revision, Clinical Modification (ICD-9/ICD-10) that describe the "alleged illness, injury, or incident claims and/or released by the settlement, judgment, or award, or for which ORM [under a first-party coverage] is assumed." *Id*. "The ICD-9/ICD-10 codes are used by Medicare to identify claims Medicare may receive, related to the incident, for Medicare claims payment and recovery purposes." *Id*

85.     CMS provides to reporting entities, such as Defendants, a list of valid ICD codes, and that list can be accessed here: https://www.cms.gov/medicare/coordination-benefits-recovery-overview/icd-code-lists (last visited October 5, 2023). The list is segregated into those codes that

are "valid" versus those that are "excluded." "Certain codes are not valid for No-Fault insurance types . . . because they are not related to the accident and may result in inappropriately denied claims." *Id*. For all the examples of un-reimbursed secondary payments, each of the accident-related payments that the MAO Assignor made on behalf of the Medicare beneficiary fall within the list of "valid" codes that CMS itself looks at when initiating recovery. In other words, CMS, as an initial matter, would consider as accident-related all the payments set forth below that the MAO Assignor made related to the accident.

86.     Moreover, with respect to the injuries that Defendants reported under Section 111, all the injuries contained within Defendants' Section 111 reports reflect injuries that are identical, or very similar, to the injuries that resulted in health care providers providing medical items and services to the MAO enrollee and thereafter billing and collecting from the MAO Assignor. CMS's manual states that it would hold Defendants responsible for reimbursing Medicare for any payments that Medicare made for same or similar injuries.[9] In fact, CMS issued a training manual for reporting entities such as Defendants, stating that "ICD Diagnosis codes are also important for claims recovery" because "if [Defendants] [have] assumed ORM for a beneficiary's broken collar bone injury due to a no-fault policy claim, the Commercial Repayment Center (CRC) will use the submitted ICD diagnosis codes to search Medicare records for claims paid by Medicare that are related to the case."[10]

87.     Further, according to the CMS manual: "If Medicare has made primary or conditional payment on claims related to the incident that should have been paid by other

---

[9]     https://www.cms.gov/files/document/mmsea-111-august-7-2023-nghp-user-guide-version-73-chapter-iv-technical-information.pdf at Section 6.2.5 (last visited October 5, 2023).

[10]    https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/NGHP-Training-Material/Downloads/ICD-Diagnosis-Code-Requirements-Part-I.pdf at p. 7 (last visited October 5, 2023).

insurance, the CRC will pursue recovery from the insurer for the Medicare benefits paid." *Id*. Medicare likewise would hold Defendants accountable for reimbursing any Medicare payments for injuries that resulted in the settlement of a third-party liability claim. For example, if Defendants reported that it settled a claim involving injuries such as a sprain of the neck and a sprain of the ankle, Medicare "will use this information to search Medicare claims history," "identify any claims paid primary . . . that relate to the neck and ankle sprains," and pursue recovery. *Id*. "An exact match on the submitted ICD-9 diagnosis codes . . . is not required." *Id*. As noted above and reflected below, all the injuries that Plaintiff identified are either identical, or very similar, to what Defendants reported in their Section 111 reports.

88.    Additionally, for each of the examples, Plaintiff confirmed that Defendants either acknowledged that the enrollee was covered by a Defendants policy or that Defendants had entered into a settlement with the enrollee arising out of the accident. Defendants also knew or should have known that its insured was a Medicare beneficiary and therefore had constructive knowledge of its duty to reimburse the MAO Assignor.

89.    The following examples of Settlement Claims illustrate Defendants' failure to fulfill their statutory duties to reimburse the MAO Assignor for conditional payments when it knew that the individuals making Defendants' insurance claims were also entitled to Medicare benefits. The representative Medicare beneficiaries listed below (identified by initials for confidentiality reasons) are illustrative examples of the many claims Defendants have failed to reimburse.

90.    The scope of Plaintiff's claims is not limited to the represented beneficiaries listed below. Plaintiff's claims seek reimbursement and other relief for the thousands of conditional payments that to date remain unreimbursed by Defendants.

91.    The examples below detail the facts that demonstrate (1) the MAO Assignor made

conditional payments for treatment to address injuries caused by an auto accident; (2) a Defendant was a primary plan with respect to that accident; (3) a Defendant had a demonstrated responsibility to pay or reimburse the MAO Assignor's conditional payments; and (4) a Defendant did not reimburse the MAO Assignor for its conditional payments, causing the MAO Assignor to sustain damages. For each claim below, the MAO Assignor executed an assignment to Plaintiff allowing Plaintiff to pursue the specific recovery of damages; the MAO Assignor did not retain any reimbursement rights; and Plaintiff satisfied all conditions precedent (to the extent any exist) to bring these claims.

### Settlement Claims Examples

92.     When Defendants enter into a settlement agreement with an injured party who is enrolled in a Medicare plan, Defendants become primary payers that are responsible for reimbursement of medical services rendered to the injured party. After executing settlement agreements in each instance identified below, Defendants failed to provide actual notice of its primary payer status to the Medicare participants who paid for the beneficiaries' medical expenses and failed to reimburse the MAO Assignor for its conditional payments.

93.     A.K-B. was injured in an automobile accident on September 25, 2017. At that time, A.K-B was enrolled in Plaintiff's MAO Assignor's MA Plan.

   a.     The incident caused A.K-B to suffer an injury to the shoulder and upper arm, and unspecified injuries to the head and neck; causing A.K-B to suffer headache, cervicalgia, and pain in the right shoulder.

   b.     A.K-B was treated for these injuries on September **30**, 2017, by the Dayton Osteopathic Hospital ("DOH") in Dayton, Ohio. A.K-B's treatments included but were not limited to: treatment in the hospital's Emergency Department; including

visit and examination by emergency Doctor Charles Macintosh D.O; receiving injections for pain; CT of head/brain, by John Bidwell M.D.; and CT of neck spine, by radiologist Louis Marone M.D.

c.      The incident caused the injuries set forth above.

d.      Treatment of A.K-B's neck and head was reasonable and necessary.

e.      A.K-B's medical providers billed the MAO Assignor $10,295.86 for the above accident-related treatment and the MAO Assignor paid $974.50 for treatment of A.K-B's incident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the incident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of incident injuries that are consistent with, the injuries that Progressive reported pursuant to Section 111.

f.      A.K-B filed a third-party claim against Progressive Insurance's insured bodily injury policy, seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the incident-related injuries set forth above.

g.      Progressive Insurance entered into a settlement with A.K-B. on July 20, 2018, with respect to this third-party bodily injury claim, arising from the incident on September 25, 2017.

h.      Progressive Insurance paid A.K-B's attorneys an undisclosed amount in exchange for a release of all claims arising out of the September 25, 2017 incident, including the claim for reimbursement of medical expenses resulting from the incident.

i.      Progressive Insurance's Section 111 report for A.K-B admits the following

details about the claims:

      i.    The settling party was Progressive Insurance's insured.

     ii.    The incident caused A.K-B to suffer unspecified injury of shoulder and upper arm (unspecified arm. Further, the settlement agreement released A.K-B's claim for medical expenses relating to these injuries).

   iii.    A.K-B's Medicare coverage was secondary, and the liability insurance was primary.

   iv.    The applicable plan was Progressive Insurance.

94.    M.G. was injured in an automobile accident on June 7, 2017, near Centerview in Johnson County, Missouri. At that time, M.G. was enrolled in Plaintiff's MAO Assignor's MA Plan.

    a.    Progressive Advanced's insured responsible for the June 7, 2017 accident was E.S. Progressive Advanced, in response to Series 15-09-321's coordination of benefits letter, did not disclose under which Policy number E.S. was insured by Progressive Advanced, but Progressive Advanced confirmed the claim number 17-1229652 as the claim to their insured policy by the MAO Assignor's beneficiary,

    b.    The accident caused M.G. to suffer injuries to the neck and lower extremities, including the right hip, knee, and ankle. These injuries caused M.G.: strain of muscle, fascia and tendon at neck level; strain of unspecified muscle(s) and tendon(s) at lower leg level, right leg; pain in right ankle and joints of right foot; pain in right hip; pain in right knee; unspecified areas edema and effusion of the right ankle.

c.      M.G. visited the Western Missouri Medical Center on June 13, 2017, and received treatment related to these injuries, including by radiologist John J Wandell, MD, and emergency medicine doctor James Blair Alford D.O. working for Pertle Springs Emergency Physicians, LLC.

d.      M.G received follow up treatment at the Golden Valley Memorial Hospital District in Clinton, MO and its clinic center on: (1) June 21, 2017, - radiology study of M.G.'s right lower extremity and report by Dr. Austin Luel Jones DO; (2) July 12, 2017, - treatment of M.G.'s injuries to the neck and right lower leg; and (3) July 24, 2017, - MRI report of the right lower extremity' joint by radiologist Dr. Michael Andrew Gilbert DO and treatment of M.G.'s right ankle with an ankle foot orthosis, multi-ligamentous ankle support, prefabricated, off-the-shelf, supplied by Hanger Prosthetics & orthotics East, Inc.

e.      The accident caused the injuries set forth above.

f.      Treatment of M.G.'s neck and lower extremity injuries was reasonable and necessary.

g.      M.G's medical providers billed the MAO Assignor $8,861.65 for the above accident-related treatment and the MAO Assignor paid $952.34 for treatment of M.G's incident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Progressive Insurance reported pursuant to

Section 111.

h.  M.G. filed a third-party claim against E.S.'s bodily injury policy, seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the accident-related injuries set forth above.

i.  Progressive Advanced entered into a settlement with M.G. on May 5, 2022, with respect to this third-party bodily injury claim, arising from the accident on June 7, 2017.

j.  Progressive Advanced paid M.G. $12,500.00 in exchange for a release of all claims arising out of the June 7, 2017's accident, including the claim for reimbursement of medical expenses resulting from the accident.

k.  Progressive Insurance's Section 111 report for M.G. admits the following details about the claims:

    i.  The accident caused M.G. to suffer an unspecified injury of neck and an unspecified injury of lower back. Further, the settlement agreement released M.G.'s claim for medical expenses relating to these injuries.

    ii.  M.G's Medicare coverage was secondary, and the liability insurance was primary.

    iii.  The applicable Plan name was Progressive Insurance.

95.  W.J. was injured in an accident on December 2, 2018. At that time, W.J was enrolled in Plaintiff's MAO Assignor's MA Plan.

a.  The other party involved in the January 27, 2018, accident was H.B., who was insured by Progressive Casualty Insurance Company.

b. The accident caused W.J. to suffer an injury to the head, a fracture of the right tibia, and injury to the right knee. W.J. received treatment on December 2, 2018, at Kings County Hospital in Brooklyn, New York.

c. The accident caused the injuries set forth above.

d. Treatment of W.J.'s injuries was reasonable and necessary.

e. Follow up care occurred on December 5, 2018, December 11, 2018 and December 12, 2018.

f. W.J.'s medical providers billed the MAO Assignor $1,885.33 for the above accident-related treatment and the MAO Assignor paid $762.25 for treatment of W.J.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Progressive Casualty Insurance Company reported pursuant to Section 111.

g. W.J. filed a third-party claim against Progressive Casualty Insurance Company's insured's bodily injury policy, seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the accident-related injuries set forth above.

h. Progressive Casualty Insurance Company entered into a settlement with W.J., with respect to this third-party bodily injury claim, signed June 4, 2021, arising from the auto accident on December 2, 2018.

i. Progressive Casualty Insurance Company paid W.J. $80,000 in exchange for a release of all claims arising out of the December 2, 2018 accident, including the

claim for reimbursement of medical expenses resulting from the accident.

    j.   Progressive Casualty Insurance Company's Section 111 report for W.J. admits the following details about the claims:

         i.   The settling party was Progressive Casualty Insurance Company's insured.

        ii.   The accident caused W.J. to suffer an unspecified injury of unspecified lower leg. Further, the settlement agreement released W.J.'s claim for medical expenses relating to these injuries.

      iii.   W.J.'s Medicare coverage was secondary, and the liability insurance was primary.

      iv.   The applicable Plan name was Progressive Insurance Company.

96.    K.A. was injured in an accident on September 8, 2018. At that time, K.A. was enrolled in Plaintiff's MAO Assignor's MA Plan.

    a.   The other party involved in the September 8, 2018, accident was insured by Progressive Classic Insurance Company.

    b.   The accident caused K.A. to suffer neck and back pain and a laceration to the scalp. K.A. received treatment on September 8, 2018, at emergency facilities in Houston, Texas.

    c.   The accident caused the injuries set forth above.

    d.   Treatment of K.A.'s injuries was reasonable and necessary.

    e.   K.A.'s medical providers billed the MAO Assignor $1,672.00 for the above accident-related treatment and the MAO Assignor paid $293.77 for treatment of K.A.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on

the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Progressive Classic Insurance Company reported pursuant to Section 111.

f.  K.A. filed a third-party claim against Progressive Classic Insurance Company's insured's bodily injury policy, seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the accident-related injuries set forth above.

g.  Progressive Classic Insurance Company entered into a settlement with K.A., with respect to this third-party bodily injury claim in August of 2019, arising from the accident on September 8, 2018.

j.  Progressive Classic Insurance Company's Section 111 report for K.A. admits the following details about the claims:

    i.  The settling party was Progressive Classic Insurance Company's insured.

    ii.  The accident caused K.A. to suffer injuries to her neck and back. Further, the settlement agreement released K.A.'s claim for medical expenses relating to these injuries.

    iii.  K.A.'s Medicare coverage was secondary, and the liability insurance was primary.

    iv.  The applicable Plan name was Progressive.

97.  P.G. was injured in an accident on October 21, 2019. At that time, P.G. was enrolled in Plaintiff's MAO Assignor's MA Plan.

a.  The other party involved in the October 21, 2019, accident was insured by Progressive Hawaii Insurance Corporation.

b.  The accident caused P.G. to suffer pain in the left lower leg, a contusion of the left front wall of the thorax, pain to her head, pain to her cervical pain and pain to her chest. P.G. received treatment on October 21, 2019, at emergency facilities in Cookeville, Tennessee.

c.  The accident caused the injuries set forth above.

d.  Treatment of P.G.'s injuries was reasonable and necessary.

e.  P.G.'s medical providers billed the MAO Assignor $2,178.00 for the above accident-related treatment and the MAO Assignor paid $533.04 for treatment of P.G.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Progressive Hawaii Insurance Corporation reported pursuant to Section 111.

f.  P.G. filed a third-party claim against Progressive Hawaii Insurance Corporation's insured's bodily injury policy, seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the accident-related injuries set forth above.

g.  Progressive Hawaii Insurance Corporation entered into a settlement with P.G., with respect to this third-party bodily injury claim arising from the accident on October 21, 2019.

h.  Progressive Hawaii Insurance Corporation's Section 111 report for P.G. admits the following details about the claims:

   i.  The settling party was Progressive Hawaii Insurance Corporation's insured.

    ii.    The accident caused P.G. to suffer a contusion to the breast and a chest wall contusion. Further, the settlement agreement released P.G.'s claim for medical expenses relating to these injuries.

    iii.    P.G.'s Medicare coverage was secondary, and the liability insurance was primary.

    iv.    The applicable Plan name was Progressive.

98.    R.B. was injured in an accident on April 13, 2018. At that time, A.T. was enrolled in Plaintiff's MAO Assignor's MA Plan.

    a.    The other party involved in the April 13, 2018, accident was insured by Progressive American Insurance Company.

    b.    The accident caused R.B. to suffer an injury to her head and thorax, and pain in her abdominal, right foot, chest and low back. R.B. received treatment on April 13, 2018, at emergency facilities in Cape Coral, Florida.

    c.    The accident caused the injuries set forth above.

    d.    Treatment of R.B.'s injuries was reasonable and necessary.

    e.    R.B.'s medical providers billed the MAO Assignor $4,467.00 for the above accident-related treatment and the MAO Assignor paid $689.57 for treatment of R.B.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Progressive American Insurance Company reported pursuant to Section 111.

    f.    R.B. filed a third-party claim against Progressive American Insurance Company's

insured's bodily injury policy, seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the accident-related injuries set forth above.

g. Progressive American Insurance Company entered into a settlement with R.B. on May 31, 2018, with respect to this third-party bodily injury claim arising from the accident on April 13, 2018.

h. Progressive American Insurance Company's Section 111 report for R.B. admits the following details about the claims:

    i. The settling party was Progressive American Insurance Company's insured.

    ii. The accident caused R.B. to suffer unspecified dorsalgia, pain in an unspecified foot, unspecified injury of the head, unspecified injury of the nose, unspecified injury of the neck and multiple fractures of the rib. Further, the settlement agreement released R.B.'s claim for medical expenses relating to these injuries.

    iii. R.B.'s Medicare coverage was secondary, and the liability insurance was primary.

    iv. The applicable Plan name was Progressive Insurance Company.

99. The cross-referencing exercise Plaintiff undertook to identify the above examples is successful in identifying some unreimbursed conditional payments. However, the bulk of those payments remain hidden without cooperation by The Defendants. Since the Defendants have been unwilling to comply with its Congressionally-mandated obligations to determine when it is a primary plan under the MSP Act and ensure that it has reimbursed all conditional payments, this litigation is necessary to ensure current and future compliance with the MSP Act. There can be

little doubt that the examples alleged above are merely the tip of the iceberg, and that thousands of other instances exist in which the Defendants has accepted premiums to cover medical expenses arising out of automobile accidents but has chosen to let Medicare and MAOs pick up the tab.

100.    The Defendants refusal to accept their Congressionally-mandated obligation to reimburse MAOs' conditional payments—instead pocketing premiums charged to cover the expenses it lets the MAOs pay—has led to this lawsuit.

### DEFENDANTS FAILED TO CONTEST THE REIMBURSEMENT CLAIM UNDER THE EXCLUSIVE ADMINISTRATIVE REVIEW PROCESS UNDER 42 U.S.C. §§ 405(G)-(H)

101.    When a party wants to dispute a claim by an MA plan, it must do so through the exclusive review process outlined in 42 U.S.C. 405(g) and 405(h). Section § 405(h) makes § 405(g), the Social Security program's judicial review provision, the sole avenue for judicial review of all claims arising under the Medicare Act.

102.    When an MAO gets billed for medical expenses incurred by its beneficiary after an injury in an incident, the MAO determines: (1) whether those expenses are covered under the health insurance policy; and, if so, (2) how much to pay. 42 C.F.R. § 422.566(b).

103.    The MAO's initial decision regarding coverage for a Medicare enrollee's medical expenses is called an "organization determination," which includes any reimbursement determination made by an MAO with respect to payment made by an MAO for Medicare covered services. 42 C.F.R § 422.566(b)(3).

104.    If any party wishes to challenge any aspect of an organization determination, that party must exhaust its administrative remedies by following a specific procedure for administrative appeal prescribed by the Medicare Act and its implementing regulations. 42 U.S.C. § 1395w–22(g); 42 C.F.R. §§ 422.560–422.622.

105.    Defendants failed to challenge MSP and the MAO Assignors' organization determination under the administrative process in 42 U.S.C. 405(g), and as a result, it is foreclosed from disputing the reimbursement amounts in this lawsuit, as no party timely appealed the MAO Assignors' organization determination (i.e., reimbursement determination).

106.    Thus, the amount Defendants owe is now fixed as to the universe of claims asserted in this action.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Equitable Estoppel

107.    Defendants have been under a continuous duty to identify and coordinate benefits with MAOs, including the MAO Assignor, and to provide proper notice to CMS of its primary payer status to ensure that conditional payments made on behalf of Medicare beneficiaries are reimbursed.

108.    Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded their obligations to the MAO Assignor and, therefore, are estopped from relying on any statute of limitations in defense of this action.

### Fraudulent Concealment

109.    All applicable statutes of limitation have been tolled by Defendants' fraudulent concealment of its status as the primary payer for the MAO Assignor's Medicare beneficiary enrollees by: (1) intentionally failing to obtain the information needed to identify whether individuals with accident-related medical expenses covered by Defendants' policies are Medicare beneficiaries enrolled in Medicare Advantage Plans, (2) failing to properly submit Section 111 reports to CMS, and (3) failing to coordinate with MAOs or their assignors in order to evade having to reimburse conditional payments. Instead of complying with the requirements of the MSP Act

and Section 111, enacted to ensure that Medicare and now MAOs are secondary payers, Defendants have intentionally and fraudulently concealed its primary payer responsibility to avoid having to reimburse conditional payments.

110.    Virtually all residents in the United States are covered under multiple policies of insurance. These policies include health, prescription, auto, and home insurance coverage. Although the enrollment process for these policies varies between carriers and policy types, certain features are common.

111.    Auto insurers, including Defendants, ask numerous questions about the insured during policy underwriting such as the policy holder's name, address, date of birth, vehicle make and model, education level, employment information, driving history, vehicle registration, license information, accident history, and whether the insured resides with individuals of driving age.

112.    Thus, when an insured makes a claim, the claim is then assigned to a claim handler to be processed through a standardized process. One of the steps in the process is to determine— for the first time—whether the claimant is Medicare eligible. Often, the claim adjuster will rely solely on responses to written forms sent to insureds, where the insureds will self-report whether they are Medicare eligible or will provide certain demographic information so the auto insurer can query Medicare's database. However, insureds are reluctant to turn over information which results in Defendants' failure to identify and reimburse payments made by Medicare Advantage Organizations.

113.    Moreover, throughout the life of a claim, the claim handler receives additional information from other third-party sources, such as examinations under oath, police records, medical bills, and the like. Defendants, however, have no process in place to extract information from those third-party sources and use that information to either query the Medicare eligibility

database or to investigate further to learn of the insured's Part C provider. This too results in missed opportunities to identify and reimburse Medicare Advantage Organizations, including the MAO Assignor in this case.

114.    Defendants know their current system is set up to result in large amounts of conditional payments being undetectable. They are undetectable because the MSP statute and implementing regulations rely on compliance by the auto insurer to make secondary payers, i.e., Medicare or MAOs, aware of the fact that someone has a primary payment responsibility. Indeed, Section 111 and 42 C.F.R. § 411.25 were specifically designed so that auto insurers come forth with information to facilitate the coordination of benefits and reimbursement of payments owed to Medicare.

115.    Defendants' choice not to change its system and processes to result in accurate and complete coordination between itself and Medicare and MAOs amounts to fraudulent concealment that tolls the statute of limitations for all claims that Plaintiff or its MAO Assignor were unable to discover due to Defendant's fraud.

116.    Defendants may register as an RRE for itself or for any direct subsidiary in its corporate structure.[11] Further, a parent company (regardless of whether it fits the formal definition of an RRE) may register as an RRE for any subsidiary in its corporate structure.[12] Accordingly,

_____

[11] MMSEA Section 111 Liability Insurance (Including Self-Insurance), No-Fault Insurance, and Workers' Compensation User Guide, *available at* https://www.cms.gov/Medicare/Coordinationof-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/NGHPTraining-Material/Downloads/Responsible-Reporting-Entity.pdf; *see* CMS, Mandatory Insurer Reporting for Non-Group Health Plans (NGHP), https://www.cms.gov/Medicare/Coordinationof-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/Overview.html.
[12] MMSEA Section 111 Liability Insurance (Including Self-Insurance), No-Fault Insurance, and

any of Defendants' subsidiaries may also be liable to Plaintiff. As illustrated by the labyrinthine organizational list attached hereto as **Exhibit A**, Defendants are each subsidiaries of Progressive Corporation, and other Progressive-named subsidiaries include Progressive Select Insurance Company, Progressive Hawaii Insurance Corp., Progressive American Insurance Company, Progressive Casualty Insurance Company, and a multitude of others.

117.    As further evidence of Defendant's concealment of information, in violation of federal law, Plaintiff attempted to coordinate benefits solely on those claims that Plaintiff could identify from reports that Defendants made under Section 111. As described above and below, Plaintiff sent hundreds of letters to better understand whether Defendants fulfilled their obligation to reimburse Plaintiff's MAO Assignor. Instead of cooperating and providing information as the law requires, Defendants refused to provide information as discussed in paragraph 66, *supra*.

118.    In fact, for the first-party and third-party examples above, Defendants ignored Plaintiff's requests to coordinate benefits—failing to provide any response whatsoever.

119.    None of these reasons are valid reasons to refuse to provide information pursuant to Section 411.25. Instead, they reflect conduct that amounts to fraudulent concealment of information that Defendants are required to disclose and that concealment tolls the statute of limitations to the extent Plaintiff was unable to identify an actionable claim because of Defendants' conduct.

---

Workers' Compensation User Guide, *available at* https://www.cms.gov/Medicare/Coordinationof-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/NGHPTraining-Material/Downloads/Responsible-Reporting-Entity.pdf.

## CAUSES OF ACTION

### COUNT I
### Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A) for Settlement Claims
### (Seeking the MAO Assignor's Unreimbursed Conditional Payments)

120.    Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-119 as if fully set forth herein.

121.    Plaintiff asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

122.    Defendants were a primary plan for the Settlement Claims.

123.    Plaintiff's MAO Assignor, as part of providing Medicare benefits under the Medicare Advantage program, paid for accident-related items and services that were reasonable and necessary and which were also covered by a third-party policy that provided bodily injury coverage for accident-related medical expenses or by a first-party policy that provided UM or UIM coverage.

124.    The MAO's Medicare beneficiaries made claims against Defendants' third-party policies to recover the medical expenses the MAO Assignor paid for items and services that were reasonable, necessary, and related to an accident. Defendants entered into settlements with the MAO Assignor's beneficiaries relating to accidents but failed to reimburse the MAO Assignor for accident-related medical expenses paid by the Assignor.

125.    Defendants had a nondelegable duty to reimburse the MAO Assignor for payments it made for medical expenses related to an accident. Defendants are responsible for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

126.    Defendants have and had a demonstrated responsibility to reimburse accident-related secondary payments relating to the Settlement Claims by failed to do so causing Plaintiff's

MAO Assignor damages. Defendants' responsibility to reimburse the MAO Assignor for its Settlement Claims conditional payments is demonstrated by the fact that Defendants entered into settlements with respect to the accidents with MAO Assignor's enrollees.

127.    To the extent it was necessary, Defendants failed to administratively appeal the MAO Assignor's rights to reimbursement within the administrative remedies period. Defendants, therefore, are time-barred from challenging the propriety, reasonableness, and necessity of the amounts paid.

128.    Defendants were required to timely reimburse the MAO Assignor for conditional payments of its Medicare beneficiaries' accident-related medical expenses.

129.    Defendants derived substantial monetary benefit by placing the burden of financing medical treatments on the MAO Assignor in violation of the MSP Act and to the detriment of the Medicare program.

130.    Plaintiff seeks to recoup only those medical items or services provided to the MAO Assignor's Medicare beneficiary enrollees that were related to motor vehicle accidents covered by Defendants' insurance policies.

131.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), for reimbursement of its MAO Assignor's secondary payments and to recover statutory double damages from Defendants for their failure to make appropriate and timely reimbursement of conditional payments for Medicare beneficiaries' accident-related medical expenses.

## COUNT II
### Breach of Contract for Failure to Pay Benefits for the Contractual Claims
### (Seeking the MAO Assignor's Unreimbursed Conditional Payments)

132.    Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-119 as if fully set forth herein.

133. Plaintiff alleges certain claims here by way of subrogation.

134. At all material times, the MAO Assignor provided health insurance to Medicare beneficiaries, including those set forth in the examples above.

135. The MAO Assignor is subrogated to the right to recover from Defendants, in all instances in which Defendants are a primary plan, for Defendants' failure to make primary payment or reimbursement to the MAO Assignor for accident-related medical expenses.

136. The MAO Assignor paid for its enrolled Medicare beneficiaries' accident-related medical expenses in amounts to be proven at trial, pursuant to its agreements with CMS.

137. Defendants failed or refused to make primary payments of no-fault insurance benefits, or medical-payment benefits, as it was obligated to do.

138. Defendants' failure to pay or make timely reimbursement for the MAO Assignor's enrolled Medicare beneficiaries' accident-related medical expenses has caused the MAO Assignor damages, as set forth here, in amounts to be proven at trial.

139. To the extent necessary and not otherwise preempted by federal statute or regulation, Plaintiff complied with all applicable conditions precedent to the institution of this claim for reimbursement.

140. For the First Party Claims, including those where Defendants issued policies in states where no-fault coverage is mandatory, as well as states where first-party medical coverage is optional, Defendants had a contractual obligation to pay benefits under a first-party policy that covered medical expenses.

**COUNT III**
**Fraudulent Concealment**

141. Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-119 as if fully set forth herein.

142. As described above, Plaintiff and its MAO Assignor's ability to identify and recover secondary payments is only as good as Defendants' compliance with its duty to report its

primary payer status, as required by federal law.

143.    Based on the claims information reported to CMS under Section 111, Plaintiff identified instances in which Defendants failed to properly reimburse on reported claims.

144.    In addition, on information and belief, Plaintiff alleges Defendants have not and cannot report all claims because it deliberately designed and operates a claim adjusting system that results in repeated, systematic failures to disclose its primary payer status for all first party policy claims and settlement claims as is its duty under the MSP Act and its implementing regulations.

145.    For all First Party Policy claims and Settlement claims, Defendants' duty is to disclose information about its primary payer status to CMS, for the benefit of Medicare and, by extension, MAOs such as Plaintiff's MAO Assignor.

146.    Defendants' primary payer status and the fact it acted as the first-party insurer or settled a liability claim under a third-party policy are pieces of information known and/or accessible only to Defendants, because they possessed exclusive and/or superior knowledge as to such facts. Moreover, Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or its MAO Assignor.

147.    By virtue of its repeated, systematic failure to report its primary payer status when it acted as the first-party insurer or settled a liability claim under a third-party policy, Defendants knowingly and/or recklessly concealed this information breaching the duty prescribed to it under the MSP Act and its implementing regulations.

148.    Defendants' knowing and/or reckless concealment of its primary payer status by means of failure to report under Section 111 is a breach of duty separate and distinct from its failure to properly reimburse under the MSP Act and its implementing regulations.

149.    Plaintiff and its MAO assignor were unaware of the concealed material facts relating to Defendants' primary payer status for unreported First Party Policy and Settlement Claims and Plaintiff and its MAO Assignor would not have acted as they did if they had known Defendants were a primary payer for the unreported First Party Policy and Settlement Claims.

150.    Specifically, Plaintiff's MAO Assignor would not have made any secondary payments if Defendants had properly disclosed primary payer status before Plaintiff's MAO Assignor paid. Moreover, Plaintiff would have timely pursued reimbursement against Defendants, through issuance of a demand letter, had Defendants not concealed its primary payer status from Plaintiff and its MAO Assignor. Plaintiff through its MAO Assignor justifiably relied on the absence of a Section 111 report when making secondary payments on the unreported first party policy and settlement claims.

151.    Because the omission of the material fact that Defendants were a primary payer for the unreported First Party Policy and Settlement Claims, Plaintiff and its MAO Assignor sustained damages when the MAO Assignor paid for items and services that were the responsibility of Defendants. Had Plaintiff and its MAO Assignor known of the facts Defendants knowingly and/or recklessly concealed, Plaintiff's MAO Assignor would not have paid for items and services that were the responsibility of Defendants. In addition, even in instances where Plaintiff's MAO Assignor made such payments, Plaintiff would have timely pursued reimbursement against Defendants.

**COUNT IV**
**Declaratory Relief Pursuant to 28 U.S.C. § 2201**
**(As Related to the MAO Assignor's Unreimbursed Payments)**

152.    Plaintiff re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs 1-119 as if fully set forth here.

153.    Plaintiff alleges that as part of providing Medicare benefits under the Medicare Advantage program, Plaintiff's assignor paid for items and services which were also covered by no-fault, personal injury protection, or medical payments policies issued by Defendants.

154.    Defendants entered into settlements with beneficiaries relating to accidents but failed to reimburse Plaintiff's assignor for accident-related medical expenses paid by Plaintiff's assignor. As primary payers, Defendants had a nondelegable duty to reimburse conditional payments advanced by Medicare participants for accident-related medical services rendered to covered persons. Defendants are liable for reimbursement of these accident-related medical expenses, even if they subsequently paid out the maximum benefits under the policies.

155.    Defendants were required to timely reimburse Plaintiff's assignor for conditional payments made on behalf of beneficiaries' accident-related medical expenses.

156.    An actual, present, and justiciable controversy has arisen between Plaintiff and Defendants concerning their obligation to reimburse Plaintiff's assignor.

157.    Plaintiff seeks a declaratory Judgment from this Court establishing that Defendants have a historical, present, and continuing duty to reimburse Plaintiff's assignor for payments made on behalf of beneficiaries' accident-related medical expenses.  Plaintiff also seeks a declaration of what amounts are due and owing by Defendants to Plaintiff's assignor.

158.    A determination of what amounts are owed by Defendants to Plaintiff's assignor is complicated and difficult.

159.    A coordination-of-benefits process requires plans to share information between the primary payer and secondary plan and to act in good faith.

160.    The Code of Federal Regulations defines the coordination of benefits system as a

"coordination of benefits transaction."[13]

161.    The coordination of benefits transaction involves the exchange of thousands of claims data and data points between the parties to determine overlapping instances where Plaintiff's assignor made payment of medical items and services on behalf of a Medicare beneficiary who was entitled to the benefit of insurance coverage provided by the Defendants. This includes not only instances in which a Medicare beneficiary was directly insured by Defendants, but also instances in which a Medicare beneficiary was injured by Defendants' policyholder.

162.    The exchange of claims data would need to be done by extracting and producing certain data fields from Defendants' and Plaintiff's databases by using demographic identifiers, such as Social Security Number ("SSN"), Health Insurance Claim Number ("HICN"),[14] date of birth, sex, and address. Beneficiary matching pinpoints the number of relevant insureds and simplifies the process of identifying reimbursable claims, which is done by matching the date of loss (for Defendants), with dates of payment (for Plaintiff), and then discovering what Defendants reimbursed (if anything), and to whom.

163.    Given the size of the claims and data points being exchanged between the parties, the coordination of benefits transaction is complex.

164.    Thus, Plaintiff lacks an adequate legal remedy to obtain the requested information.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all of the triable issues within this pleading.

---

[13] The "coordination of benefits transaction" is the transmission from any entity to a health plan for the purpose of determining the relative payment responsibilities of the health plan, of either of the following for health care: (a) claims and (b) payment information. 45 CFR § 162.1801.

[14] Also known as a Medicare Beneficiary Identifier ("MBI").

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendants granting the following relief:

i.      A judgment for any secondary payments made by Plaintiff's MAO Assignor which Defendants should have paid based on its primary payer status for First Party Policy Claims and Settlement Claims;

ii.     A judgment awarding double damages for those amounts to which Plaintiff is entitled to reimbursement as allowed under 42 U.S.C. § 1395y(b)(3)(A);

iii.    In the alternative, a declaratory judgment for the relief requested in Count IV;

iv.     A judgment awarding Plaintiff pre-judgment and post-judgment interest;

v.      Attorneys' fees as may be allowed under any applicable law;

vi.     Tolling any applicable statute of limitations for First Party Policy Claims and Settlement Claims Defendants were under a duty to report pursuant to Section 111 but concealed by means of its failure to properly report; and

vii.    A judgment awarding Plaintiff such other and further relief as the Court deems just and proper under the circumstances.

Dated: October 13, 2023

Respectfully Submitted,

*/s/ Mark E. Silvey*
Mark E. Silvey, Esq.*
TN Bar No.:  013415
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Email:  msilvey@milberg.com
Secondary Email: ralves@milberg.com

*/s/ Martha A. Geer*
Martha A. Geer, Esq.*
NC Bar No.: 13972
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
900 W Morgan Street
Raleigh, NC 27603
Primary emails: mgeer@milberg.com
Secondary Email: ralves@milberg.com

*/s/ Jimmy W. Mintz*
Jimmy W. Mintz, Esq.*
FL Bar No.: 113363
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
201 Sevilla Avenue, Suite 200
Coral Gables, FL 33314
Primary email:  jmintz@milberg.com
Secondary Email: ralves@milberg.com

*Attorneys for Plaintiff*
*(\* Pro Hac Vice Motions Pending)*